1   WILLIAM McGRANE [57761]
     MAUREEN HARRINGTON [194606]
2   McGRANE GREENFIELD LLP
     One Ferry Building, Suite 220
3   San Francisco, California 94111
     Telephone:   (415) 283-1776
4   Facsimile:   (415) 283-1777
     wmcgrane@mcgranegreenfield.com
5
     BRIAN J. HANNON [99750]
6   McGRANE GREENFIELD LLP
     40 South Market Street, Second Floor
7   San Jose, California  95113
     Telephone:   (408) 995-5600
8   Facsimile:   (408) 995-0308
     bhannon@mcgranegreenfield.com
9
     Attorneys for Plaintiff
10  DALE SAKAI, in his capacity as Trustee of the
     Fusako Sakai 1995 Revocable Trust

11

12               UNITED STATES DISTRICT COURT

13          NORTHERN DISTRICT OF CALIFORNIA

14             SAN FRANCISCO DIVISION

15

16

17  DALE SAKAI, in his capacity as Trustee of    Case No.  06-2581 (MMC)
     the Fusako Sakai 1995 Revocable Trust
18  under Trust Agreement dated June 27, 1995,  **THIRD AMENDED**
                                 **COMPLAINT FOR DAMAGES**
19           Plaintiff,
20                         1.  Violation of the California Elder
     v.                              Abuse and Dependant Adult Civil
21                              Protection Act
     MERRILL LYNCH LIFE INSURANCE      2.  Breach of Fiduciary Duty
22  COMPANY, a Washington corporation;      3.  Violation of the California Unfair
     and MERRILL LYNCH LIFE AGENCY,            Competition Law
23  INC., a Washington corporation

24           Defendants.

25

26

1    Plaintiff DALE SAKAI, in his capacity as Trustee of the Fusako Sakai
2    1995 Revocable Trust under Trust Agreement dated June 27, 1995 ("Plaintiff"),
3    alleges as follows:

**JURISDICTION**

5    1.    Plaintiff and Fusako Sakai are citizens of the State of California.
6    Plaintiff is informed and believes, and thereon alleges, that Defendants MERRILL
7    LYNCH LIFE INSURANCE COMPANY ("Merrill Lynch Life") and MERRILL
8    LYNCH LIFE AGENCY, INC. ("Merrill Lynch Agency") are corporations
9    incorporated under the laws of the State of Washington having their principal
10   place of business in the State of New Jersey.  This court has original jurisdiction
11   under 28 U.S.C. §1332, in that it is a civil action between citizens of different
12   states in which the matter in controversy, exclusive of costs and interests, exceeds
13   $75,000.00.

**INTRADISTRICT ASSIGNMENT**

15   2.    Venue is proper in this district in that Plaintiff and Fusako Sakai
16   reside and Defendants transact business here, and the conduct complained of
17   occurred here.

**PARTIES**

19   3.    Fusako Sakai is, and at all times relevant herein was, a resident of
20   San Francisco County, California.
21   4.    Dale Sakai is, and at all times relevant herein was, a resident of San
22   Mateo County, California.  He is the nephew of Fusako Sakai.
23   5.    On or about June 27, 1995, Miss Sakai established the Fusako Sakai
24   1995 Revocable Trust under Trust Agreement dated June 27, 1995 ("Trust").
25   Plaintiff is a duly appointed trustee of the Trust and he is authorized under the
26   terms and conditions of the Trust Agreement to bring this action.

6.     On or about August 1, 2002, Miss Sakai, as principal, executed a Durable Power of Attorney duly appointing Plaintiff as her attorney in fact.  Miss Sakai has authorized Plaintiff to act in her name, place, and stead, and for her use and benefit, and she has given and granted to him full power and authority to do and perform every act as fully as she might or could do.  In particular, Miss Sakai has authorized Plaintiff to make, sign, and execute any agreements or other instruments in writing of whatever kind and nature as might be necessary, convenient, or proper.  The Durable Power of Attorney provides that it shall not be affected by the subsequent incapacity of Miss Sakai.  Miss. Sakai has not revoked or amended the Durable Power of Attorney, and it remains in full force and effect.

7.     Plaintiff is informed and believes, and thereon alleges, that Merrill Lynch & Co., Inc. ("Merrill Lynch"), is, and at all times relevant herein was, licensed to conduct a securities brokerage business in the State of California. Plaintiff is informed and believes, and thereon alleges, that at all relevant times, Merrill Lynch has been a member of the New York Stock Exchange Inc. and the National Association of Securities Dealers ("NASD") and is subject to the rules of those organizations.  Among other things, Merrill Lynch specializes in providing financial planning and advice to individual investors nationwide, including residents of the State of California.  Merrill Lynch boasts that its financial advisors "take the time to understand [an investor's] life in full and in depth. They look beyond the single dimension of investments and find powerful, innovative ways to integrate and leverage all the pieces of [the investor's] financial life."  (*See* http://askmerrill.ml.com/fa_front/1,2280,,00.html [accessed Mar. 21, 2006].)

8.     Plaintiff is informed and believes, and thereon alleges, that Defendant Merrill Lynch Life is, and at all times relevant herein was, an insurance company engaged in the business of marketing and selling insurance products,

1  including, without limitation, variable annuities, to individuals nationwide,

2  including California.  Plaintiff is informed and believes, and thereon alleges, that

3  Merrill Lynch Life is a wholly-owned subsidiary of Merrill Lynch Insurance

4  Group, which, in turn, is a wholly owned subsidiary of Merrill Lynch.

5       9.    Plaintiff is informed and believes, and thereon alleges, that

6  Defendant Merrill Lynch Agency is licensed under the laws of the State of

7  California to sell insurance products, including, without limitation, variable

8  annuities, to residents of the State of California.  Plaintiff is informed and believes,

9  and thereon alleges, that Merrill Lynch Agency is, and at all times relevant herein

10  was, authorized to transact business in California on behalf of Merrill Lynch Life.

11       10.   Plaintiff is informed and believes, and thereon alleges, that at all

12  times relevant herein, Louis H. Tiano, Jr. acted as Miss Sakai's financial adviser

13  and consultant.  Plaintiff is further informed and believes, and thereon alleges, that

14  Mr. Tiano is licensed under the laws of the State of California to sell insurance

15  products, including, without limitation, variable annuities, to residents of the State

16  of California.  Plaintiff is further informed and believes, and thereon alleges, that

17  Mr. Tiano is, and at all times relevant herein was, fully authorized by Merrill

18  Lynch Life and Merrill Lynch Agency to transact business and act on their behalf

19  and that he did transact business and act on their behalf in connection with the

20  transactions with Miss Sakai, as alleged herein.

21       11.   Plaintiff is informed and believes, and thereon alleges, that at all

22  times relevant herein, Defendants, and each of them, were the agents, servants and

23  employees of each of the remaining Defendants and in doing things hereinafter

24  alleged, were acting within the course and scope of such agency, service and

25  employment.

26

# FACTUAL ALLEGATIONS

12.     Defendants market and sell variable annuities.  Variable annuities are hybrid investments containing both securities and insurance features.  The securities feature provides the investor with an opportunity to participate in potential capital appreciation and income through investments in the securities markets.  The insurance feature provides tax-deferred treatment of any accumulated earnings.  The insurance feature also permits the investor to receive a series of periodic payments from the investment over time and provides a death benefit to the investor's beneficiary should the investor die during the accumulation phase.  But unlike traditional insurance products, where an insurance company is, in essence, betting that the insured will live longer than expected, with a variable annuity product, the insurance company is, in essence, betting that the annuitant will die sooner than expected.

13.     Although variable annuities have existed in some form or another for many years, prior to 1990, the sale of such annuities comprised a relatively small portion of insurance companies' business.  However, starting in 1990, because of major changes in the retirement market, the sales of annuities increased dramatically.  Moreover, because of the relatively large commissions that insurance companies pay agents selling such annuities, agents have had a strong economic incentive to market and sell variable annuities instead of other investments.

14.     In 1996, the NASD, which had become increasingly concerned about the marketing and sales of variable annuities, issued a notice to its members stating:

> As securities, the sales and distribution of Variable Contracts are fully subject to the NASD's sales practice rules. The issue of suitability under Rule 2310 arises when a Variable Contract is

recommended and sold to a public customer. Rule 2310 requires that, in recommending to a customer the purchase, sale, or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by the customer regarding his or her other securities holdings and financial situation and needs.

> *In making such recommendations, the member and its registered representatives are required to make reasonable efforts to obtain information concerning the customer's financial and tax status, the customer's financial objectives, and such other information used or considered to be reasonable by the member or registered representative in making recommendations to the customer.*

. . .

> Finally, NASD Regulation is aware of the practice whereby a registered representative replaces a customer's existing variable contract with a new variable contract that doesn't improve the customer's existing position, but generates a new sales commission for the registered representative. Such a replacement practice designed merely to generate new sales commissions for the registered representative would be prohibited by NASD Conduct Rules requiring that members and registered representatives deal fairly with customers.

(NASD Notice to Members 96-86 (Dec. 1996) (emphasis added).)   A true and correct copy of the NASD Notice to Members 96-86 is attached hereto as Exhibit "1" and is incorporated herein by this reference as though fully set forth.

15.   In May 1999, the NASD issued another notice to its members stating:

> The myriad features of variable insurance products make the suitability analysis required under NASD rules particularly complex. NASD Regulation has addressed suitability issues in variable insurance products sales in *Notice to Members 96-86.*  In that *Notice,* NASD Regulation stated that when recommending variable annuities

1         or variable life insurance, the member and its registered
2         representatives are required to make reasonable efforts to obtain
           information concerning the customer's financial and tax status,
3         investment objectives, and such information used or considered
           reasonable in making recommendations to the customer.
4

5 (NASD Notice to Members 99-35 (May 1999), p. 230.)  The NASD then outlined

6 various guidelines that members should consider adopting in order to ensure that

7 they are complying with legal and regulatory requirements.  A true and correct

8 copy of the NASD Notice to Members 99-35 is attached hereto as Exhibit "2" and

9 is incorporated herein by this reference as though fully set forth.

10      16.    On May 27, 2003, the NASD issued an "investor alert" warning

11 investors that the "marketing efforts used by some variable annuity sellers deserve

12 scrutiny – especially when seniors are the targeted investors.  Sales pitches for

13 these products might attempt to scare or confuse investors.  One scare tactic used

14 with seniors is to claim that a variable annuity will protect them from lawsuits or

15 seizures of their assets.  Many such claims are not based on facts, but nevertheless

16 help land a sale."  (NASD, *Variable Annuities: Beyond the Hard Sell* (May 27,

17 2003)      <http://www.nasd.com/web/idcplg?IdcService=SS_GET_PAGE&ssDoc

18 Name= NASDW_005976 (accessed Apr. 4, 2006).)

19      17.    The United States Securities and Exchange Commission ("SEC")

20 and the NASD recently conducted an extensive investigation concerning the

21 marketing and selling of variable insurance products, including variable annuities.

22 The SEC and the NASD observed that while "variable insurance products may be

23 appropriate investments for some investors, concerns have been raised about the

24 sale of these products."  (Office of Compliance Inspections and Examinations,

25 United Sates Securities and Exchange Commission, *Joint SEC/NASD Report on*

26

*Examination Findings Regarding Broker-Dealer Sales of Variable Insurance Products* (June 2004) [hereafter "Joint Report"], p. 2.)

18.    The SEC and NASD pointed out that in marketing and selling a variable insurance product (such as a variable annuity) to an investor, a broker-dealer recommending such product:

> must assess the investor's financial status, investment objectives, and other relevant information to determine if the product is *suitable*.   The obligation to recommend only securities that are suitable for the customer arises from the antifraud provisions of the federal securities laws, and from rules of the self-regulatory organizations ("SROs").   A broker-dealer, by hanging out its "shingle" and conducting a public securities business, impliedly represents that it will deal fairly with customers.  *As part of this obligation of fair dealing, broker-dealers must have a reasonable basis for believing that their securities recommendations are suitable for the customer in light of the customer's financial needs, objectives and circumstances.* In addition, broker-dealers must have a reasonable basis for believing that the particular security being recommended is appropriate.   Under NASD Rule 2310 and IM 2310-2, *when a broker-dealer recommends a security to a customer, it must determine that the security is suitable for that customer in light of that customer's particular age, financial situation, risk tolerance, and investment objectives.*  Because variable annuities and variable life insurance are complex products, the NASD has issued additional guidance in assessing the suitability of recommendations of variable products in Notices to Members ("NTM") 96-86, 99-35, and 00-44.

(Joint Report, p. 8 (emphasis added) (footnote omitted).)   In particular, the SEC and NASD were concerned about insurance companies and agents selling variable annuities to elderly customers for whom such long-term, illiquid products were not suitable.   They were also concerned that insurance companies had, in general, failed to adequately train and supervise their agents regarding variable annuity sales.   They cautioned the insurance companies about numerous "weak" practices that they had identified as a result of their investigation, including:

**Unsuitable variable product recommendations were made without a reasonable basis in light of information the broker may have had regarding the customer's:**

• Age;

• Financial or tax status (*e.g.,* sales that exceed a pre-determined percentage of the customer's net worth; sales that require the mortgage of a home to finance the purchase; sales that require a customer to borrow from an existing life insurance policy or annuity; or sales to a corporation, trust, or other non-natural entity that did not hold as agent for a natural person, and whose purchase therefore caused the loss of tax-deferral status in the annuity);

• Investment objectives (*e.g.,* same product recommended to all customers (one size fits all), or a customer's current need for income);

• Investment sophistication and ability to understand the complexity of variable products generally, and to monitor the investment of the separate account;

• Low risk tolerance (*e.g.,* high risk equity funds are recommended to an investor with low risk tolerance);

• Need for liquidity (*e.g.,* sale of an illiquid variable product to persons who need their funds soon, and as a result incur surrender charges to obtain their funds);

• Lack of need or desire for life insurance;

. . .

(*Id.*, pp. 9-10.)

19.    The California Department of Corporations has identified the marketing and sales of variable annuities as one of the top ten "financial scams" in California.

20.    Numerous financial websites and publications have lambasted variable annuities as unsuitable investments for almost all investors.  (*See, e.g., The Great Annuity Rip-Off* <http://www.forbes.com/forbes/1998/0209/6103106a_print.html> (accessed Apr. 4, 2006).)   Indeed, as the Wall Street Journal observed:

> Make no mistake: Variable annuities, which allow you to buy mutual funds inside a tax-deferred wrapper, are usually a horrible investment.
>
> For starters, the typical variable annuity levies sky-high fees, in part because of an often-useless insurance feature that typically guarantees your heirs will receive a minimum sum. According to Chicago's Morningstar Inc., if you buy a stock fund inside a variable annuity, you will pay total average annual costs equal to 2.37 percent of the sum invested, far above the 1.58 percent average for regular stock-mutual funds.
>
> To make matters worse, variable annuities are a favorite with unscrupulous investment advisers, who can collect ridiculously high commissions by foisting these turkeys onto unsuspecting investors.

(Jonathan Clements, *The Wall Street Journal*, Defending a Much-Maligned Investment: When Variable Annuities Make Sense, p. D1 (Oct. 20, 2004).)

21.    Fusako Sakai was born on June 1, 1914 and, as of the date of this Third Amended Complaint, is 92 years old.  She is an unmarried woman.  She lives alone, but with daily assistance from a caregiver.  Miss Sakai has a high school education.  Until she retired, she worked as a bookkeeper.

22.    Miss Sakai is hearing-impaired.  Plaintiff is informed and believes, and thereon alleges, that Miss Sakai is presently suffering from senile dementia.  Plaintiff is also informed and believes, and thereon alleges, that as a consequence of Miss Sakai's age and physical and mental condition, she is, and at all relevant

1  times herein was, incapable of properly caring for her property or transacting any

2  business or fully understanding the nature or effects of her acts.

3      23.    Defendants and Mr. Tiano have acted as Miss Sakai's financial and

4  investment adviser and have managed her financial affairs for numerous years.

5  Plaintiff is further informed and believes, and thereon alleges, that at all times

6  relevant herein, Defendants and Mr. Tiano knew or should have known that Miss

7  Sakai was hearing-impaired and suffering from senile dementia, and,

8  consequently, that she was incapable of properly caring for her property or

9  transacting business or fully understanding the nature or effects of her acts.

10      24.    Miss Sakai reposed complete trust and confidence in the care,

11  fidelity, integrity, loyalty, fairness, and good faith of Defendants and Mr. Tiano.

12  Moreover, because of her age and physical and mental condition, Miss Sakai was

13  unduly susceptible to their influence, persuasion, and inducement.  At all times

14  relevant herein, Defendants and Mr. Tiano knew or should have known that Miss

15  Sakai reposed complete trust and confidence in their fidelity, integrity, loyalty,

16  fairness, and good faith and that she was unduly susceptible to their influence,

17  persuasion, and inducement.  In addition, at all relevant times herein, Defendants

18  and Mr. Tiano have occupied a superior relationship with Miss Sakai with respect

19  to financial and investment matters and they knew or should have known that she

20  was relying on their advice and counsel.  Under these circumstances, a fiduciary

21  and confidential relationship existed between Miss Sakai and Defendants and Mr.

22  Tiano under which Defendants owed to Miss Sakai obligations of fidelity,

23  integrity, loyalty, fairness, and good faith.  Consequently, they were required to

24  strive to their utmost ability to provide competent and disinterested financial and

25  investment advice to her in a fair, just, and equitable manner, and to act in the

26  furtherance of only her best interests.

25.     In or about November 1990, when Miss Sakai was 76 years old, Defendants and Mr. Tiano influenced, persuaded, and induced her to purchase an annuity issued by Tandem Life Insurance Company ("Tandem").  Tandem issued the annuity (Contract No. TIG90504684) to Miss Sakai on December 11, 1990. The premium for the annuity was $100,000.00.  Under the terms and conditions of the annuity, Tandem agreed to begin paying Miss Sakai $1,564.14 per month, starting November 28, 1999, for a guaranteed period of ten years, and as long thereafter as she lived.  Plaintiff is informed and believes, and thereon alleges, that Defendants paid Mr. Tiano a substantial commission in connection with the annuity sale.  (Plaintiff is informed and believes, and thereon alleges, that at that time, the commission rate that insurance companies typically paid for variable annuities ranged from five to eight percent of the premium paid.)

26.     In or about November 1995, when Miss Fusako was 81 years old, Defendants and Mr. Tiano influenced, persuaded, and induced her to surrender and exchange the Tandem Annuity and to replace it with a so-called "Flexible Premium Individual Variable Annuity" issued by Merrill Lynch Life.  At the time of such surrender and exchange, the value of the Tandem Annuity was $144,231.91.

27.     On or about November 28, 1995, Merrill Lynch Life issued to Miss Sakai a variable annuity (Contract No. M951004947) ("Merrill Annuity" or "Annuity").  The premium was $144,231.91.  A true and correct copy of the Merrill Annuity is attached hereto as Exhibit "3" and is incorporated herein by this reference as though fully set forth.  Plaintiff is informed and believes, and thereon alleges, that Defendants paid Mr. Tiano a commission in connection with the annuity sale.  (Plaintiff is informed and believes, and thereon alleges, that at that

1   time, the commission rate that insurance companies typically paid for variable

2   annuities ranged from five to eight percent of the premium paid.)

3      28.   In 2004, Miss Sakai requested Merrill Lynch and Defendants to

4   transfer title and ownership of the Merrill Annuity from her to her Trust.  In or

5   about May 2004, Merrill Lynch and Defendants assured Miss Sakai and Plaintiff

6   that title and ownership of the Annuity would be transferred from Miss Sakai to

7   the Trust.  In May 2006, after this action was filed, Merrill Lynch and Defendants

8   denied that they ever agreed to or did transfer and title and ownership of the

9   Annuity from Miss Sakai to the Trust.  Consequently, in order to make it clear the

10  Annuity is an asset of the trust estate, Miss Sakai, by Plaintiff acting as her

11  attorney in fact, executed an amendment to the Trust stating that the Annuity is

12  included among the assets of the trust estate, and that title and ownership of the

13  Annuity shall be deemed to have been transferred from Ms. Sakai to the Trust as

14  of May 4, 2004.

15     29.   Among other things, the terms and conditions of the Merrill Annuity

16  provide:

17         (a)   The premium would be allocated to certain "variable

18  accounts."

19         (b)   Any income and/or gains from the variable accounts would

20  accumulate until July 1, 1999 ("Annuity Date").

21         (c)   On the Annuity Date, Merrill Lynch Life would either begin

22  making monthly payments to Miss Sakai for a guaranteed period of ten years, and

23  as long thereafter as she lived, or, if Miss Sakai elected (no later than 30 days

24  before the Annuity Date), pay her in a lump sum the value of the Merrill Annuity

25  as of the Annuity Date.

26

1        (d)     If Miss Sakai elected to receive payments for the guaranteed
2   period of ten years, but died within that period, her named beneficiaries would
3   receive the present value of any remaining payments.

4        (e)     If Miss Sakai elected to receive payments for the guaranteed
5   period of ten years, but died after ten years, Defendants would have no further
6   obligation to her estate or her named beneficiaries.

7        30.    In view of Miss Sakai's age, physical and mental condition, and
8   financial situation, Defendants and Mr. Tiano knew or should have known that
9   surrendering and exchanging the Tandem Annuity and replacing it with the Merrill
10   Annuity was an entirely unsuitable and inappropriate investment for Miss Sakai
11   for several reasons, including, without limitation, the following:

12        (a)     Variable annuities are relatively illiquid investments because
13   the annuity owner is generally required to pay a "deferred sales charge" equal to a
14   percentage of the amount withdrawn if he or she makes a withdrawal value of the
15   annuity before a specified date (usually seven-to-ten years).  Plaintiff is informed
16   and believes, and thereon alleges, that the purpose of levying deferred sales
17   charges is to reimburse the insurance companies for the sales commissions that
18   they paid to the agents selling the annuities.  In this case, for example, if Miss
19   Sakai had withdrawn any funds from the Merrill Annuity during the first year, she
20   would have had to pay a deferred sales charge exceeding $10,000.00.

21        (b)     The expenses that insurance companies charge to defray their
22   actual and anticipated costs and expenses are relatively high when measured
23   against the costs and expenses of similar investments (*e.g.*, mutual funds).
24   Consequently, in this case, Miss Sakai has paid thousand of dollars more in
25   expenses to Defendants than she would have paid had Defendants properly
26

1  advised and counseled her to take a lump sum payment from Tandem and invest it

2  in a more suitable investment (*e.g.*, a mutual fund).

3        (c)    Any income and/or gains from a variable annuity are taxed at

4  the annuity owner's ordinary income tax rate rather than the much more favorable

5  capital gain rate.  Consequently, in this case, Miss Sakai has paid and will pay

6  more in taxes than she would have paid had Defendants and Mr. Tiano properly

7  advised and counseled her to take a lump sum payment from Tandem and invest it

8  in a more suitable investment (*e.g.*, a mutual fund).

9        (d)    Unlike other investments (*e.g.*, mutual funds), variable

10  annuities do not receive a "stepped-up basis" upon the death of the annuity owner.

11  Consequently, the owner's estate may, under some circumstances, end up having

12  to pay *both* income taxes (again, at ordinary income tax rates) *and* estate and

13  inheritance taxes.

14        (e)    If Miss Sakai died within the ten-year guaranteed period, her

15  named beneficiaries would receive only the present value of any remaining

16  payments.

17        (f)    If Miss Sakai died after the ten-year guaranteed period,

18  Defendants would have no further obligation to her estate or her named

19  beneficiaries.

20      31.    In or about May 1999 – about two months or so before the Annuity

21  Date, Miss Sakai informed Defendants and Mr. Tiano that she intended to

22  withdraw all of her funds from the Merrill Annuity on the Annuity Date.  The

23  value of the Merrill Annuity at that time was approximately $248,000.00.  At that

24  time, Defendants and Mr. Tiano dissuaded Miss Sakai from withdrawing all of her

25  funds from the Merrill Annuity in a lump sum and they influenced, persuaded, and

26  induced her instead to accept monthly payments for a guaranteed period, and as

1   long thereafter as she lived. In addition, they also influenced, persuaded, and

2   induced her to shorten the guaranteed payment period from ten years to five years.

3          32. As of July 1, 1999 – the Annuity Date – the value of the Merrill

4   Annuity was $267,047.78. Since then, Miss Sakai has been receiving monthly

5   payments from Defendants in the amount of $3,024.96 less federal and state taxes.

6          33. The five-year guaranteed payment period expired on June 30, 2004,

7   at which time Miss Sakai was 90 years old. Plaintiff is informed and believes, and

8   thereon alleges, that as of June 30, 2004, the value of the Merrill Annuity

9   (assuming an average annual rate of return of 6.50 percent) was approximately

10   $155,000.00. Plaintiff is further informed and believes, and thereon alleges, that

11   as of April 1, 2006, the value of the Merrill Annuity (assuming an average annual

12   rate of return of 6.50 percent) was approximately $107,000.00. Consequently,

13   although Miss Sakai is entitled under the Merrill Annuity to continue receiving

14   monthly payments until her death, when she dies, Defendants will have no further

15   obligation under the Merrill Annuity to her estate or her named beneficiaries.

16          34. In view of Miss Sakai's age, physical and mental condition, and

17   financial situation, Defendants and Mr. Tiano knew or should have known that

18   receiving payments over a guaranteed period of five years instead of taking a lump

19   sum payment was an entirely unsuitable and inappropriate investment for Miss

20   Sakai for several reasons, including, without limitation, the following:

21         (a) Any income or gains from the Merrill Annuity would be

22   taxed at an ordinary income tax rate rather than the much more favorable capital

23   gain rate. And, in fact, Miss Sakai has paid more in taxes than she would have

24   paid had she been properly advised and counseled to take a lump sum payment

25   and invest it in a more suitable investment (*e.g.*, a mutual fund).

26

(b)     If Miss Sakai died within the five-year guaranteed period, her named beneficiaries would receive only the present value of any remaining payments.  Any income and/or gains included in such value would then be taxed at ordinary income tax rates.

(c)     If Miss Sakai died after the five-year guaranteed period, Defendants would have no further obligation to her estate or her named beneficiaries.

(d)     The State of California would charge a so-called "premium tax" of several thousand dollars.

35.     Miss Sakai appointed Dale Sakai as a co-trustee of the Trust on or about August 1, 2002.  Miss Sakai continued to act as trustee until she resigned in early 2003.  In or about December 2002, Plaintiff contacted and informed Mr. Tiano that Miss Sakai was transferring all her accounts from Merrill Lynch to Goldman Sachs.  A telephonic conference was held in December 2002, attended by Plaintiff, representatives of Goldman Sachs and representatives of Defendants to discuss the transfer of all assets of Miss Sakai and the Trust to her new trust account at Goldman Sachs.  During that call, Defendants' representatives were unable to explain a small credit transaction which was later discovered to be the regular monthly annuity payment.  During the telephonic conference call Plaintiff asked Mr. Tiano whether said credit transaction was due to an annuity investment product.  Mr. Tiano told Plaintiff  "No.  I don't think so." At the conclusion of the telephonic conference call between Defendants representatives, Goldman Sachs and the Plaintiff it was agreed that proper provisions were in place to transfer all of Miss Sakai's Merrill Lynch assets into her Goldman Sachs account and close her Merrill Lynch  account.  Merrill Lynch and Goldman Sachs agreed to set up a

1   regular "sweep" of the Merrill Lynch account to move assets to Goldman Sachs as

2   soon as possible, for a limited period of time.

3       36.   Execution of said plan was to take several months in that certain

4   assets could not be immediately liquidated or transferred.  After all of the accounts

5   supposedly had been transferred from Merrill Lynch to Goldman Sachs, Plaintiff

6   noticed that Ms. Sakai was still receiving statements from Merrill Lynch.  Upon

7   inquiry by Plaintiff, Goldman Sachs representatives could not explain the

8   situation.  The asset "sweep period" was then extended by Goldman Sachs with

9   the cooperation of Merrill Lynch,  thinking that more time was needed to liquidate

10  final assets.  Several months went by and in or about September 2003, Plaintiff

11  noticed that the Merrill Lynch account had still not been closed.  Upon further

12  inspection, Plaintiff determined that a small credit transaction of the same amount

13  was occurring on a monthly basis.  Plaintiff was unable to determine the source of

14  the monthly credit transaction, which could not be explained by Goldman Sachs or

15  Merrill Lynch.  Upon inquiry to Miss Sakai, she was also unable to explain the

16  source of the monthly credit transaction.  It was only by calling the "1-800"

17  number provided on the statement in or about December 2003 or early January

18  2004 that Plaintiff was at last informed that the monthly credit transfers were from

19  an annuity which Miss Sakai had been sold.  Having at last been told by Merrill

20  Lynch that the monthly credit transfers were derived from an annuity, he searched

21  diligently in Miss Sakai's files and learned that it was the second annuity that had

22  been sold to Miss Sakai.

23      37. Plaintiff attempted to get additional information regarding the Merrill

24  Annuity and Tandem Annuity.  On or about February 13, 2004, Plaintiff met with

25  Joan Mensinger, Merrill Lynch's Director/Regional Administrative Manager for

26  the  Pacific  West  Region.   The  purpose  of  the  meeting  was  to  seek  further

1   information regarding the financial services provided to Miss Sakai, including

2   specifically asking Ms. Mensinger to explain the suitability of the Tandem

3   Annuity and the Merrill Annuity as investments for Miss Sakai.  In addition and

4   during that February 2004 meeting, Plaintiff provided Ms. Mensinger with copies

5   of Miss Sakai's estate planning documents and executed authorizations to allow

6   Plaintiff to act as a trustee of the Trust.  Ms. Mensinger wrote to Plaintiff via e-

7   mail on February 13, 2004, and promised that she had "already forwarded

8   [Plaintiff's] requests to the appropriate parties."

9       38. After several status inquires and on March 19, 2004, Plaintiff

10   confirmed via e-mail to Ms. Mensinger that he had finally received a telephone

11   call from Deborah Corrigan, the manager of Merrill Lynch's Berkeley, California

12   office, confirming that "work was in progress to answer our questions."  On

13   March 23, 2004, Ms. Mensinger responded to Plaintiff's e-mail by suggesting that

14   Plaintiff deal with Ms. Corrigan, and advising that "the compliance dept has

15   written to your aunt about the annuity."  In fact, the only communication sent

16   regarding the Merrill Annuity was a demand that Miss Sakai execute a "Letter of

17   Authorization" to allow Defendants to communicate with Plaintiff, although

18   authorization had previously been provided, including during the February 2004

19   meeting with Ms. Mensinger; this letter was not received until on or about April 5,

20   2004.  During April 2004, Plaintiff communicated by e-mail multiple times with

21   Ms. Mensinger and Ms. Corrigan, repeatedly asking for responses to his inquiries,

22   as well as final confirmation on precisely what authorization Defendants needed to

23   add him as a co-trustee and authorize communication with him.  On April 14,

24   2004, Ms. Corrigan sent an e-mail stating that she was sending the needed

25   documentation to authorize the change in trustee information to Plaintiff.  That

26   documentation was received by Plaintiff on or about April 19, 2004, and promptly

Third Amended Complaint For Damages

1   returned.  On April 30, 2004, Plaintiff e-mailed Ms. Corrigan to confirm that the

2   documents had been received; she confirmed receipt by e-mail on May 4, 2004,

3   and stated that "[t]he title change should take place any day…" to transfer all

4   accounts into the name of the Trust.  On May 13, 2004, Plaintiff followed up with

5   another e-mail to Ms. Mensinger and Ms. Corrigan noting that he had "yet to hear

6   word on any of the issues I raised at my meeting in February…."

7       39. In a letter dated May 4, 2004, but received after Plaintiff's May 13,

8   2004, e-mail, Defendants provided the first information regarding the Tandem

9   Annuity and the Merrill Annuity in response to Plaintiff's multiple requests for

10  information.  Unfortunately, the letter was merely a historical recounting of events

11  and provided no information regarding any analysis done by Defendants or their

12  agents regarding the suitability of the Tandem Annuity or Merrill Annuity as an

13  investment for Miss Sakai.  The letter did, however, advise unequivocally that

14  Miss Sakai was induced to purchase the Tandem Annuity and Merrill Annuity by

15  Mr. Tiano.  There was nothing in the May 4, 2004, letter to suggest that Mr. Tiano

16  advised Miss Sakai that investments could afford her the similar or better benefits

17  without restricting access to her funds or incurring the commission and fees of an

18  annuity.  Moreover, there is nothing in the letter to indicate that Mr. Tiano

19  performed any investigation into the suitability of the Tandem Annuity or the

20  Merrill Annuity as an investment for Miss Sakai.

21      40. The paucity of information provided regarding the suitability of the

22  Merrill Annuity as an investment for Miss Sakai in light of her age and financial

23  situation caused Plaintiff to continue to seek more detailed responses from

24  Defendants by further e-mails and meetings with agents of Defendants.  On July

25  28, 2004, he again e-mailed Ms. Mensinger requesting information on the

26  "Suitability of Selling [Tandem] Annuity and [Merrill] Annuity."  Ms. Mensinger

1   responded by e-mail on July 29, 2004, to "apologize that you have not received all

2   of the information you requested or an explanation as to why it was not

3   provided…" and promised to follow up.  On August 9, 2004, Ms. Corrigan wrote

4   to Plaintiff by e-mail to set up a time for a meeting and expressing the hope that

5   "we can resolve the outstanding items…."   After multiple efforts to schedule a

6   meeting failed, Plaintiff at last met with Ms. Corrigan and Riley Estridge,

7   Managing Director for Merrill Lynch, on October 19, 2004, to discuss the

8   suitability of the sales of the Tandem Annuity and the Merrill Annuity.  At this

9   meeting, Mr. Estridge defended the sale of the Tandem Annuity generally,

10  although no specifics were provided regarding suitability.  While Mr. Estridge

11  admitted that the case was not as clear cut for the Merrill Annuity, he still

12  maintained the investment was appropriate although he did not provide specifics.

13  Following this meeting, Defendants again delayed months in responding to still

14  pending requests for information regarding the suitability of the Tandem Annuity

15  and Merrill Annuity, ultimately providing no further information to Plaintiff.

16      41. When Defendants, after the incomplete response provided by the May

17  4, 2004, letter, continued to evade requests for information and did not provide

18  justification for why the Tandem Annuity and the Merrill Annuity were suitable

19  investments for Miss Sakai, Plaintiff concluded that, in fact, the investments were

20  not suitable and could not be justified by Defendants.  Thus, within two years of

21  the filing of this action, and after the May 4, 2004, letter which acknowledged that

22  the Tandem Annuity and Merrill Annuity were purchased on the recommendation

23  of Defendants through their agent, Mr. Tiano, Plaintiff formed the opinion that

24  given his aunt's age, medical condition, and financial circumstances, the Merrill

25  Annuity was an entirely unsuitable investment.  At no time prior to the period

26  within two years of the filing of this action did Miss Sakai discover or have any

1   reason to suspect that the Merrill Annuity was an entirely unsuitable investment

2   for her; that discovery was made solely through the efforts of Plaintiff as detailed

3   above.

4                    **FIRST CLAIM FOR RELIEF**

5            [For Violation of the California Elder Abuse and Dependant
                          Adult Civil Protection Act
6                (Cal. Welf. & Inst. Code §§15600 *et seq.*)]

7        42.    Plaintiff incorporates by reference as though fully set forth herein

8   each and every allegation contained in Paragraphs 1 through 41, inclusive.

9        43.    In 1985, the State of California enacted the California Elder Abuse

10  and Dependant Adult Civil Protection Act ("Elder Abuse Act" or "Act"), which is

11  codified at California Welfare and Institutions Code Sections 15600 *et seq*.

12       44.    In enacting the Elder Abuse Act, the California Legislature

13  recognized that elderly persons may be subjected to abuse and that the "state has a

14  responsibility to protect these persons." (Cal. Welf. & Inst. Code §15600(a).)

15       45.    The Legislature recognized further that elderly persons make up "a

16  significant and identifiable segment of the population and that they are more

17  subject to the risks of abuse." (Cal. Welf. & Inst. Code §15600(b).)  Therefore,

18  the Legislature stated, it "desire[d] to direct special attention to the needs and

19  problems of elderly persons." (*Id.*)

20       **46.    But, the Legislature declared, even though infirm elderly persons**

21  **constitute a "disadvantaged class, . . . few civil cases are brought in connection**

22  **with this abuse due to problems of proof, court delays, and the lack of incentives**

23  **to prosecute these suits." (Cal. Welf. & Inst. Code §15600(h).)  Therefore, the**

24  **Legislature declared that "[i]t is the further intent of the Legislature in adding**

25  **Article 8.5 (commencing with Section 15657) to this chapter to enable**

26

1   interested persons to engage attorneys to take up the cause of abused

2   elderly persons and dependent adults.  (*Id.* at §15600(j).)

3       47.   "Abuse," as defined under the Elder Abuse Act, includes not only

4   physical abuse and neglect, but also "financial abuse."  (Cal. Welf. & Inst. Code

5   §15610.07(a).)  Under Section 15610.30:

6       (a)   "Financial abuse" of an elder . . . occurs when a person or
        entity does any of the following:
7

8           (1)   Takes, secretes [*sic*], appropriates, or retains
                real or personal property of an elder . . . to a wrongful
9               use or with intent to defraud, or both.

10          (2)   Assists in taking, secreting, appropriating, or
11              retaining real or personal property of an elder . . . to a
                wrongful use or with intent to defraud, or both.
12

13  Under Section 15610.30(b), "a person or entity shall be deemed to have taken,

14  secreted, appropriated, or retained property for a wrongful use if, among other

15  things, the person or entity takes, secretes [*sic*], appropriates or retains possession

16  of property in bad faith."  A person or entity "shall be deemed to have acted in bad

17  faith if the person or entity knew or should have known that the elder had the right

18  to have the property transferred or made readily available to him or her or to his or

19  her representative."  (Cal. Welf. & Inst. Code §15610.30(b)(1).)

20      48.   Section 15657.5 of the Elder Abuse Act states:
21

22      (a)   Where it is proven by a preponderance of the evidence that a
            defendant is liable for financial abuse, as defined in Section
23          15610.30, in addition to all other remedies otherwise provided by
            law, the court shall award to the plaintiff reasonable attorney's fees
24          and costs. The term "costs" includes, but is not limited to, reasonable
            fees for the services of a conservator, if any, devoted to the litigation
25          of a claim brought under this article.

26

(b)    Where it is proven by a preponderance of the evidence that a defendant is liable for financial abuse, as defined in Section 15610.30, and where it is proven by clear and convincing evidence that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of the abuse, in addition to reasonable attorney's fees and costs set forth in subdivision (a), and all other remedies otherwise provided by law, the following shall apply:

(1)    The limitations imposed by Section 377.34 of the Code of Civil Procedure on the damages recoverable shall not apply.[1]

(2)    The standards set forth in subdivision (b) of Section 3294 of the Civil Code regarding the imposition of punitive damages on an employer based upon the acts of an employee shall be satisfied before any damages or attorney's fees permitted under this section may be imposed against an employer.

(c)    Nothing in this section affects the award of punitive damages under Section 3294 of the Civil Code.

49.    Defendants are "entities" within the meaning of California Welfare and Institutions Code Section 15610.30.

50.    Plaintiff is informed and believes, and thereon alleges, that in 1995, when Defendants and Mr. Tiano influenced, persuaded, and induced Miss Sakai to surrender and exchange the Tandem Annuity and to replace it with the Merrill Annuity, they did so not because it was in Miss Sakai's best interests, but because it was in their best interests.

51.    Defendants and Mr. Tiano concealed and failed to disclose to Miss Sakai all pertinent facts that were necessary for her to make an informed decision concerning whether to surrender and exchange the Tandem Annuity and to replace

---

[1]    Code of Civil Procedure Section 377.34, which concerns survival actions, limits recoverable damages to losses sustained prior to death, and prohibits recovery of damages for pain, suffering, or emotional distress.

1  it with the Merrill Annuity. They also failed to recommend that she seek her

2  family's guidance and advice before making any decision. Plaintiff is informed,

3  and believes, and thereon alleges that Defendants and Mr. Tiano concealed these

4  facts and failed to advise Miss Sakai to seek her family's guidance and advice with

5  the intention of inducing her to surrender and exchange the Tandem Annuity and

6  to replace it with the Merrill Annuity. If Defendants and Mr. Tiano had properly

7  disclosed all pertinent facts to Miss Sakai or if they had recommended that she

8  seek her family's guidance and advice before making any decision, she would

9  have sought her family's guidance and advice. And, her family, in turn, would

10  have counseled her to withdraw all the funds from the Tandem Annuity and invest

11  them in a more suitable and appropriate investment. At that time, Miss Sakai

12  relied on her family's guidance and advice, and she would have followed their

13  counsel.

14      52.    Plaintiff is informed and believes, and thereon alleges, that in 1999,

15  when Defendants and Mr. Tiano dissuaded Miss Sakai from withdrawing all of her

16  funds from the Merrill Annuity in a lump sum and influenced, persuaded, and

17  induced her instead to accept monthly payments over a guaranteed period of five-

18  years, they did so not because it was in Miss Sakai's best interests, but because it

19  was in their best interests. In particular, Plaintiff is further informed and believes,

20  and thereon alleges, that when Defendants and Mr. Tiano dissuaded Miss Sakai

21  from withdrawing all of her funds from the Merrill Annuity in a lump sum and

22  influenced, persuaded, and induced her instead to accept monthly payments over a

23  guaranteed period of five-years, they did so with the hope and expectation that

24  *either* she would die within five years, in which case, Defendants would have to

25  pay her named beneficiaries only the present value of the remaining payments, *or*,

26

1   should she survive for the guaranteed period, she would die shortly thereafter, in

2   which case, Defendants would not have to pay the beneficiaries any amount.

3         53.    Defendants and Mr. Tiano concealed and failed to disclose to Miss

4   Sakai all pertinent facts that were necessary for her to make an informed decision

5   concerning whether to accept monthly payments instead of a lump sum payment.

6   They also failed to recommend that she seek her family's guidance and advice

7   before making any decision.  Plaintiff is informed, and believes, and thereon

8   alleges that Defendants and Mr. Tiano concealed these facts and failed to advise

9   Miss Sakai to seek her family's guidance and advice with the intention of inducing

10   her to accept monthly payments instead of a lump sum payment without first

11   seeking her family's guidance and advice.  If Defendants and Mr. Tiano had

12   properly disclosed all pertinent facts to Miss Sakai or if they had recommended

13   that she seek her family's guidance and advice before making any decision, she

14   would have sought her family's guidance and advice.  And, her family, in turn,

15   would have counseled her to withdraw all the funds from the Merrill Annuity and

16   invest them in a more suitable and appropriate investment.  At that time, Miss

17   Sakai relied on her family's guidance and advice, and she would have followed

18   their counsel.

19         54.    Plaintiff demanded that Defendants agree to rescind the Merrill

20   Annuity.  He offered to return to Defendants all the monthly payments that Miss

21   Sakai had received from them on the condition that Defendants agree to pay her

22   the value of the Merrill Annuity as of July 1, 1999 (*i.e.*, $267,047.78).  Defendants

23   rejected Plaintiff's offer, and they continue wrongfully and in bad faith to retain

24   Miss Sakai's property.

25         55.    Defendants' wrongful acts and omissions, as herein alleged,

26   constitute "financial abuse" under the Elder Abuse Act.

56.     With full knowledge of all relevant facts, Defendants ratified the acts and omissions of their agent, Mr. Tiano.

57.     As a proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained damages in an amount exceeding $75,000.00, according to proof.

58.     Defendants are guilty of recklessness, oppression, fraud, or malice, within the meaning of California Welfare and Institutions Code Section 15657 and, accordingly, Plaintiff is entitled to an award of punitive and exemplary damages, according to proof.

59.     Under California Civil Code Section 3345, Defendants are liable for treble damages and penalties because: (a) Defendants knew or should have known their conduct was directed toward Ms. Sakai, a senior citizen; (b) Defendants' conduct caused Ms. Sakai to suffer substantial loss of property set aside for retirement, and of assets essential to her health and welfare; and (c) as a senior citizen, Miss Sakai is more vulnerable than other members of the public to Defendants' conduct because of her age and her physical and mental condition, and she has suffered substantial economic damages resulting from Defendants' conduct.

60.     Plaintiff has incurred, and will continue to incur attorney's fees and other costs to prosecute this action against Defendants.  If Plaintiff prevails in this action, he is entitled to an award of attorney's fees and costs under California Welfare and Institutions Code Section 15657.

61.     This action is being filed within two years of the date that Plaintiff discovered, or in the exercise of reasonable diligence, could have discovered the facts giving rise to this cause of action, and, consequently, it is timely under California law.  Miss Sakai did not discover the facts giving rise to the claims for

1   relief alleged herein at any time; the discovery of the facts alleged herein were

2   made by Plaintiff within a date within two years prior to the filing of this action.

3   Moreover, in the exercise of reasonable diligence, neither Miss Sakai nor Plaintiff

4   could t have discovered such facts until a time within two years of the filing of this

5   action.   In any event, Defendants are estopped by their wrongful acts and

6   omissions, as alleged herein, from asserting an affirmative defense based on any

7   statute of limitations under California law.

8                           **SECOND CLAIM FOR RELIEF**
                              [For Breach of Fiduciary Duty]
9

10          62.    Plaintiff incorporates by reference as though fully set forth herein

11   each and every allegation contained in Paragraphs 1 through 41 and Paragraphs 43

12   through 61, inclusive.

13          63.    Plaintiff is informed and believes, and thereon alleges, that in 1995,

14   when Defendants and Mr. Tiano influenced, persuaded, and induced Miss Sakai to

15   surrender and exchange the Tandem Annuity and to replace it with the Merrill

16   Annuity, they did so not because it was in Miss Sakai's best interests, but because

17   it was in their best interests.

18          64.    At all times relevant herein, a fiduciary relationship existed between

19   Miss Sakai and Defendants and Mr. Tiano.  In light of that fiduciary relationship,

20   Defendants owed Miss Sakai a duty to disclose all material information in their

21   possession relating to her investments.  Such material information included tax

22   treatment of various investments and its impact on Miss Sakai's investment

23   strategy, including the tax treatment of mutual funds a compared to annuities; the

24   relative risks of investment in a mutual fund or funds compared to an annuity; the

25   liquidity of an annuity compared to a mutual fund and the penalties for early

26   liquidation of an annuity; and the comparative long-range impact upon Miss

1   Sakai's financial plan of choosing an annuity over some other investment,

2   including a mutual fund or funds.  Defendants and Mr. Tiano concealed and failed

3   to disclose to Miss Sakai all pertinent facts that were necessary for her to make an

4   informed decision concerning whether to surrender and exchange the Tandem

5   Annuity and to replace it with the Merrill Annuity, or to instead cash out her

6   investment and choose to invest her funds in a mutual fund or some other

7   investment.  They also failed to recommend that she seek her family's guidance

8   and advice before making any decision.  Based upon Miss Sakai's records and

9   conversations with Miss Sakai, Plaintiff is informed, and believes, and thereon

10   alleges that Defendants and Mr. Tiano intentionally concealed these material facts

11   with intent to deceive Miss Sakai, and they intentionally failed to advise Miss

12   Sakai to seek her family's guidance and advice with the intention of inducing her

13   to surrender and exchange the Tandem Annuity and to replace it with the Merrill

14   Annuity.  Had the facts above been disclosed to Miss Sakai, she would have been

15   aware that investments other than annuities would provide her with better tax

16   advantages; that investments other than annuities would provide her with greater

17   liquidity; that investments other than annuities would provide her with similar

18   returns; that investments other than annuities would provide her with the same or

19   similar amounts of income; and that other investments would continue to grow in

20   value.  In addition, Miss Sakai was not advised that Mr. Tiano would receive a

21   substantially higher commission for selling her an annuity, as opposed to

22   recommending a more suitable investment option such as a mutual fund.  Had

23   Miss Sakai been informed of all of these facts, she would not have purchased the

24   Tandem Annuity or the Merrill Annuity, and, in event, would have chosen to cash

25   out the Merrill Annuity in 1999.

26

65.   In addition to failing to disclose material information they were under a duty to disclose to Miss Sakai, Defendants and Mr. Tiano did the following acts and made the following recommendations to induce Miss Sakai to exchange the Tandem Annuity and replace it with the Merrill Annuity instead of cashing out her investment and making other investment choices:

(a)   That Defendants and Mr. Tiano have confirmed that on or about November 28, 1995, Mr. Tiano suggested to Miss Sakai that she roll the value of the Tandem Annuity into the Merrill Annuity for the supposed reasons that the Tandem Annuity had "expired," that interest rates had declined, and that Miss Sakai had indicated that she did not need to draw on the assets for present living expenses, all of which factors are, to the knowledge of Defendants and Mr. Tiano, irrelevant in comparing investment in the Merrill Annuity with other available investments for which Miss Sakai would have been charged lower fees and which had superior tax advantages but which would not net for defendants the exorbitant fees, commissions and other guaranteed and potential profits, and limitations on sharing those profits with Plaintiff or her estate that Defendants and Mr. Tiano would receive and did receive from steering Miss Sakai to this investment.  In making these misstatements, Defendants and Mr. Tiano intended that Miss Sakai would rely upon them, and Miss Sakai reasonably did rely on such misrepresentations, to her resulting damage.

(b)   That in or about November 1995, Defendants, acting through and with their agent and co-conspirator, Mr. Tiano, transmitted to Miss Sakai certain information (including, without limitation, financial projections, pro forma spreadsheets, prospectuses, brochures, and/or explanations) designed by Defendants to impress unsophisticated investors such as Miss Sakai and promoting and extolling the advantages, flexibility and profitability of purchasing the Merrill

1    Annuity by exchanging the Tandem Annuity.  At the time Defendants and Mr.

2    Tiano transmitted these materials stating that the Merrill Annuity investment was

3    an appropriate and advantageous choice for Miss Sakai, Defendants and Mr. Tiano

4    knew that such statements were untrue in that purchase of the Merrill Annuity had

5    virtually no advantage to Miss Sakai or to her estate or heirs compared with other

6    available investments.  Defendants and Mr. Tiano also knew, and in violation of

7    their fiduciary duty failed to disclose, that the Merrill Annuity did not have the

8    significant tax advantages and reduced cost of such other investments, such that

9    the proposed purchase of the Merrill Annuity only served to enrich and earn

10   commissions and fees for Defendants and Mr. Tiano, ultimately to the cost and

11   detriment of Miss Sakai and her estate.   In making these misstatements,

12   Defendants and Mr. Tiano intended that Miss Sakai would rely upon them, and

13   Miss Sakai reasonably did rely on such misrepresentations, to her resulting

14   damage.

15           (c)    That Defendants have confirmed that on or about November

16   28, 1995, Mr. Tiano suggested to Miss Sakai that she roll the value of the Tandem

17   Annuity into the Merrill Annuity, by telling Miss Sakai that such investment

18   would be tax deferred, offer long-term growth through allocations among different

19   subaccounts, offer a supposed guaranteed death benefit, offer a supposed stream of

20   income, offer a supposed variety of annuitization options and withdrawal feature,

21   supposedly without a deferred sales charge, all of which reasons were promoted

22   by defendants and which they instructed and trained Mr. Tiano to use such

23   statements.   In fact, Defendants knew that such statements were false and

24   misleading in that the supposed advantages were available at lower overall cost

25   and fees, and with more potential for profit and tax advantage to Miss Sakai and/or

26   her estate and legatees, through a combination of other investments, such as

1   mutual funds and/or fixed annuities, and that the investment in the Merrill Annuity

2   actually had deferred sales charges through excessive fees, had less tax

3   advantages, had no advantage in terms of allocation among a portfolio, and offered

4   less likelihood of a stream of income or growth due to excessive fees and charges,

5   compared to other investments such as a mutual fund.  The factors extolled by Mr.

6   Tiano at the direction and behest of Defendants are irrelevant in comparing

7   investment into the Merrill Annuity with other available investments for which

8   Miss Sakai would have been charged lower fees and which had superior tax

9   advantages but which would not earn the exorbitant fees, commissions and other

10   certain and potential profits that Defendants and Mr. Tiano would receive and did

11   receive from steering Miss Sakai to this investment.   In making these

12   misstatements, Defendants and Mr. Tiano intended that Miss Sakai would rely

13   upon them, and Miss Sakai reasonably did rely on such misrepresentations, to her

14   resulting damage.

15         (d)    That Defendants themselves contend that they prepared and

16   presented to Miss Sakai at the time of purchase a prospectus and contract, for

17   state-mandated 10 day "free look" period, knowing that such prospectus and

18   contract were incomprehensible even to a sophisticated and legally trained person,

19   let alone to Miss Sakai, and that the prospectus and contract, to the degree they

20   could be understood, misleadingly touted the same supposed "advantages" more

21   fully alluded to above, while concealing from Miss Sakai that Defendants and Mr.

22   Tiano had knowledge that other investments offered the same or similar supposed

23   advantages and flexibility at less cost, with lower fees and superior tax advantages

24   such that the profits to Miss Sakai and to her estate would have been superior to

25   the Merrill Annuity.  Defendants and Mr. Tiano knowingly and intentionally

26   provided the said prospectus, contract and "free look" period as additional sales

1    tools, to encourage and induce Miss Sakai to complete purchase of the Annuity by

2    not cancelling her investment within the 10 day period, while knowing but

3    concealing that the statements therein were misleading and contained statements

4    implying advantages such as profitability and flexibility that were not the

5    complete truth because they failed to disclose that other investments were, to the

6    knowledge of Defendants and Mr. Tiano, superior to the Merrill Annuity.

7    Defendants and Mr. Tiano knew that their statements as alleged above were false

8    and misleading, and made such statements with the intent that Miss Sakai would

9    rely thereon, and in fact, Miss Sakai did reasonably rely upon the statements and

10    misstatements of Defendants and Mr. Tiano to her resulting damage.   If

11    Defendants and Mr. Tiano had properly disclosed all pertinent facts to Miss Sakai

12    or if they had recommended that she seek her family's guidance and advice before

13    making any decision, she would have sought her family's guidance and advice.

14    And, her family, in turn, would have counseled her to withdraw all the funds from

15    the Merrill Annuity and invest them in a more suitable and appropriate investment.

16    At that time, Miss Sakai relied on her family's guidance and advice, and she

17    would have followed their counsel.

18        66.    In May 1999, Miss Sakai contacted Defendants through their agent,

19    Mr. Tiano, and advised them that she wanted to withdraw funds from the Merrill

20    Annuity upon the Annuity Date.  Defendants and Mr. Tiano again turned to false,

21    misleading and incomplete information to induce Miss Sakai not to withdraw all

22    her funds from the Merrill Annuity.  Instead of truthfully advising Miss Sakai that

23    it was to her advantage given her age, finances and health situation to invest her

24    money in a fairly liquid investment with limited tax liability such as a mutual fund

25    or funds, Defendants and Mr. Tiano advised and represented to Miss Sakai, who

26    was then 85 years old, that she had a bewildering array of "options" for

"annuitizing the Contract."  Defendants and Mr. Tiano presented to her a series of misleading and befuddling "illustrations," such as of "life with return of contract value," "life with five years certain," "life with 10 years certain," and "life with 15 years certain" (at which time Miss Sakai would be 100 years old) while informing Miss Sakai that it was in her best interests financially to choose one of these options instead of taking a lump sum payment.  Defendants and Mr. Tiano had such forms and "options" prepared and formulated to dissuade annuity owners such as Miss Sakai from withdrawing their investment in a lump sum and so as to induce them instead to accept monthly payments, while knowing that the same or similar investments in an array of securities could be made at far less cost in fees and for far superior tax advantages to Miss Sakai and/or her estate had she withdrawn the funds in a lump sum, invested them elsewhere and merely drawn on the funds as needed.  The annuitization "options" are knowingly and intentionally presented by Defendants and their agents, to such generally elderly owners of such contracts, with terms of 5, 10 and 15 years, to make it seem that by accepting a 5-year annuitization the annuity owners are largely achieving their goal, or a good compromise with the goal that they came in with, of actually withdrawing their funds in a lump sum because of their advanced age.  In fact, however, accepting the annuitization of the contract prevents the annuity owners and their estates from receiving tax advantages and potential upside profit from their investments, and results on an actuarial basis in appropriating such profits for Defendants, which was not disclosed.  Plaintiff is informed and believes, and thereon alleges, that in 1999, when Defendants and Mr. Tiano dissuaded Miss Sakai from withdrawing all of her funds from the Merrill Annuity in a lump sum and influenced, persuaded, and induced her instead to accept monthly payments over a guaranteed "certain" period of five-years, they did so not because it was in Miss Sakai's best interests

Third Amended Complaint For Damages

as they stated to her, but because it was in their best interests.  In particular, Plaintiff is further informed and believes, and thereon alleges, that when Defendants and Mr. Tiano dissuaded Miss Sakai from withdrawing all of her funds from the Merrill Annuity in a lump sum and influenced, persuaded, and induced her instead to accept monthly payments over a guaranteed period of five-years, they did so with the hope and expectation that *either* she would die within five years, in which case, Defendants would have to pay her named beneficiaries only the present value of the remaining payments, *or*, should she survive for the guaranteed period, she would die shortly thereafter, in which case, Defendants would not have to pay the beneficiaries any amount.  Defendants and Mr. Tiano, rather than clearly and explicitly disclosing these consequences to Miss Sakai, and the loss of the investment value and tax advantages to her estate, instead emphasized the "certainty" of short-term and life payments to be made under the annuitization options, without regard to the actual needs of Miss Sakai or the actual cost of such options.  Defendants and Mr. Tiano, in failing to disclose the advantages of the lump sum payment over annuitization and/or annuitization with only five years of guaranteed payments, and in falsely stating that it was in Miss Sakai's best interest to choose annuitization, mislead Miss Sakai and did so intentionally.  The statements and representations of Defendants and Mr. Tiano, as detailed above were false.  Defendants and Mr. Tiano knew that such statements and representations were false and made such statements to Miss Sakai with the intention that she rely upon those false and misleading statement. Miss Sakai did reasonably rely upon the false and misleading statements of Defendants and Mr. Tiano, to her damage and detriment.

67.    If Defendants and Mr. Tiano had properly disclosed all pertinent facts to Miss Sakai or if they had recommended that she seek her family's

1    guidance and advice before making any decision, she would have sought her

2    family's guidance and advice.  And, her family, in turn, would have counseled her

3    to withdraw all the funds from the Merrill Annuity and invest them in a more

4    suitable and appropriate investment.  At that time, Miss Sakai relied on her

5    family's guidance and advice, and she would have followed their counsel.

6        68. In doing the things alleged herein, Defendants breached their fiduciary

7    obligations of fidelity, integrity, loyalty, fairness, and good faith.

8        69.    As a proximate result of Defendants' breach of fiduciary duty as

9    alleged herein, Plaintiff has sustained damages in an amount exceeding

10    $75,000.00, according to proof.

11        70.    Defendants are guilty of recklessness, oppression, fraud, or malice,

12    and, accordingly, Plaintiff is entitled to an award of punitive and exemplary

13    damages, according to proof.

14        71.    This action is being filed within two years of the date that Plaintiff

15    discovered, or in the exercise of reasonable diligence, could have discovered the

16    facts giving rise to this cause of action, and, consequently, it is timely under

17    California law.  Miss Sakai did not discover the facts giving rise to the claims for

18    relief alleged herein at any time; the discovery of the facts alleged herein were

19    made by Plaintiff within a date within two years prior to the filing of this action.

20    Moreover, in the exercise of reasonable diligence, neither Miss Sakai nor Plaintiff

21    could t have discovered such facts until a time within two years of the filing of this

22    action.   In any event, Defendants are estopped by their wrongful acts and

23    omissions, as alleged herein, from asserting an affirmative defense based on any

24    statute of limitations under California law.

25    ///

26    ///

### THIRD CLAIM FOR RELIEF

[For Violation of the California Unfair Competition Law
(Cal. Bus. & Prof. Code §§17200 *et seq.*)]

72.     Plaintiff incorporates by reference as though fully set forth herein each and every allegation contained in Paragraphs 1 through 41, Paragraphs 43 through 56, and Paragraphs 63 through 68.

73.     The California Unfair Competition Law (Cal. Bus. & Prof. Code §§17200 *et seq.*) prohibits any person from engaging in any unlawful, unfair or fraudulent business act or practice.

74.     When Defendants dissuaded Miss Sakai from withdrawing all her funds from the Merrill Annuity in a lump sum and they influenced, persuaded, and induced her instead to accept monthly payments for a five-year guaranteed period, and as long thereafter as she lived, they did do for their own advantage and benefit.

75.     Moreover, even though Defendants and Mr. Tiano knew or should have known that receiving payments over a guaranteed period of five years instead of taking a lump sum payment was an entirely unsuitable and inappropriate investment for Miss Sakai, nonetheless, they failed to disclose to her all of the material facts that were necessary for her to make an informed decision.   If Defendants and Mr. Tiano had properly disclosed all pertinent facts to Miss Sakai or if they had recommended that she seek her family's guidance and advice before making any decision, she would have sought her family's guidance and advice. And, her family, in turn, would have counseled her to withdraw all the funds from the Merrill Annuity and invest them in a more suitable and appropriate investment. At that time, Miss Sakai relied on her family's guidance and advice, and she would have followed their counsel.

76.     Defendants are "persons" within the meaning of the California Unfair Competition Law.

77.     Defendants' practices and acts, as herein alleged, constitute unfair business practices and acts within the meaning of the California Unfair Competition Law.  As a result of engaging in such practices and acts, Defendants have deceived Miss Sakai and other members of the general public and are likely to continue deceiving members of the general public.

78.     Plaintiff has incurred, and will continue to incur attorney's fees and other costs to prosecute this action against Defendants.  If Plaintiff prevails in this action, he is entitled to an award of attorney's fees and costs.

79.     This action is being filed within two years of the date that Plaintiff discovered, or in the exercise of reasonable diligence, could have discovered the facts giving rise to this cause of action, and, consequently, it is timely under California law.  Miss Sakai did not discover the facts giving rise to the claims for relief alleged herein and the fact that the investments recommended and sold to her by Defendants were entirely unsuitable until a date within two years of the filing of this action.  Moreover, in the exercise of reasonable diligence she could not have discovered such facts until a time within two years of the filing of this action.   In any event, Defendants are estopped by their wrongful acts and omissions, as alleged herein, from asserting an affirmative defense based on any statute of limitations under California law.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     For general and compensatory damages according to proof;

2.     For an order requiring Defendants to make full restitution to Plaintiff of any monies that they received from Miss Sakai as the result of their having engaged in any unfair practices and acts;

1      3.      For treble damages as permitted under Civil Code section 3345;+

2      4.      For punitive and exemplary damages according to proof;

3      5.      For the attorney's fees and other legal costs incurred in prosecuting

4 this action;

5      6.      For interest on all sums as allowed by law;

6      7.      For costs of suit; and

7      8.      For such other and further relief as the Court may deem just and

8 proper.

9

Dated: January 4, 2007        McGRANE GREENFIELD LLP

10

11

12                     By:   /s/ Maureen A. Harrington

13                         MAUREEN A. HARRINGTON
                          Attorneys for Plaintiff

14                         DALE SAKAI, in his capacity as
                         Trustee of the Fusako Sakai 1995

15                         Revocable Trust

16

17

18

19

20

21

22

23

24

25

26

Third Amended Complaint For Damages

1

## <u>DEMAND FOR JURY TRIAL</u>

2      Please take notice that Plaintiff DALE SAKAI, in his capacity as Trustee of

3 the Fusako Sakai 1995 Revocable Trust, demands that this case be tried before a

4 jury.

5 Dated:  October 16, 2006          McGRANE GREENFIELD LLP

6

7                                    BY:    /s/ Maureen A. Harrington
                                           MAUREEN A. HARRINGTON
8                                          Attorneys for Plaintiff
                                           DALE SAKAI, in his capacity as
9                                          Trustee of the Fusako Sakai 1995
                                           Revocable Trust
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26